## ALBION PHOSPHATE MIN. CO. v. WYLLIE et al

(Circuit Court of Appeals, Fourth Circuit. November 25, 1896.)

No. 148.

1. ACCOUNT—ACTION ON—PLEADING—DEMAND OF COPY—ADMISSION OF EVIDENCE.

Under section 179 of the South Carolina Code of Procedure, providing that a party need not set out in a pleading the items of an account sued on, but shall, upon demand, deliver a copy of the account, a defendant who has omitted to demand a copy of an account, sued on generally, has no right to object to the plaintiff's proving the several sums constituting the full amount demanded.

2. SALES—ANALYSIS OF SAMPLES—PROOF OF CUSTOM.

Where a contract for the sale of merchandise provides for taking samples from the cargo, which are to be kept until the completion of discharge, and then sent to a chemist for analysis, and that the cargo is to be taken from the vessel's tackles by the buyer, who is to be responsible for any demurrage arising from failure to do so, a custom of the trade to permit the buyer to take and deal with the merchandise, before the analysis has shown whether or not it conforms to the contract, does not contradict such contract; and it is not error to permit proof of such custom, in an action involving the contract.

3. FACTORS—DEL CREDERE COMMISSIONS—ANALYSIS OF SAMPLES—DEFECTIVE QUALITY.

W. & G., acting for the A. Co. on del credere commission, sold a cargo of phosphate rock, for which they made advances to the A. Co., according to their contract, but permitted the buyer to take possession before the analysis had determined whether or not the rock was a good delivery, and without making any payment on account of the price. The analysis showed that the rock was not a good delivery, and after negotiations, in which they acted in good faith, and according to their best judgment, W. & G. settled with the buyer, by allowing him a deduction from the price. *Held*, that W. & G. were not bound, for the purpose of putting the A. Co. in a more advantageous position, to insist on the buyer's acceptance of the rock which the analysis had shown to be defective, and were not liable to the A. Co. for failing to exact payment in advance, but the A. Co. were liable to make W. & G. whole.

4. SAME—DEL CREDERE COMMISSIONS—PURCHASE TO FILL CONTRACTS.

When an agent, acting on del credere commission, has procured, from other sources, a part of the merchandise necessary to fill a contract which he has made for his principal, but which the principal is unable wholly to fulfill, he is entitled to commissions from the principal on the whole amount of merchandise contracted for.

5. SAME—PROCURING RELEASE FROM CONTRACT—COMMISSIONS.

When an agent, acting on del credere commission, has procured for his principal a contract, which such principal is unable to fulfill, and has procured a release of such contract, he is entitled to a proportionate share of his agreed commissions.

In Error to the Circuit Court of the United States for the District of South Carolina.

Alexander King (Theodore G. Barker and Marshall, Marbury & Bowdoin on briefs), for plaintiff in error.

Augustine T. Smythe, for defendants in error.

Before GOFF, Circuit Judge, and HUGHES and PAUL, District Judges.

PAUL, District Judge. This case is brought here on a writ of error to a judgment of the circuit court for the district of South Carolina. The case was tried by the court, the parties having waived a trial by jury in accordance with the provisions of section 648 of the Revised Statutes of the United States. On the evidence submitted, the court filed the following findings of facts and conclusions of law:

"This is an action at law on a money demand, brought by Wyllie & Gordon, subjects of Great Britain, against the Albion Phosphate Company, a corporation organized under the laws of the state of West Virginia. Both parties submit to the jurisdiction of the court. The cause of action is on an account for moneys advanced by plaintiffs to defendant at its request and for commissions; in all £2,-494. 2s. 10d. The answer, admitting the alienage of the plaintiffs and the citizenship of the defendant, denies every other allegation of the complaint. It contains a second defense and a counterclaim. That plaintiffs, in the transactions set up by them, acted as agents of defendant, and in those transactions failed to discharge their duties properly and faithfully, and thereby became indebted to the defendant in the sum of £806. 7s. 6d., with regard to a cargo shipped to them on their order by steamship Cyanus, and sold by them on del credere commission; and also with regard to a cargo of phosphate rock shipped to them on their order by steamship Oaklands, and sold by plaintiffs on a del credere commission. The total counterclaim is £2,435. 15s. 2d. The reply to the counterclaim consists of a denial of its allegations.

"Findings of Fact.

"(1) The plaintiffs are aliens, subjects of Great Britain, residents in England, doing business under the firm name as brokers, engaged principally, if not entirely, in selling phosphate rock, have had long and successful business experience, and enjoy high mercantile character.

"(2) The defendant is a corporation organized under the laws of West Virginia, engaged in the mining of phosphate rock in the state of Florida, and in preparing it for market, and in shipping it to various parts of the United States and of foreign countries. At the time of the transactions mentioned in the pleadings, it had but recently begun mining, and the shipments in question were the first, or among the first, made by it abroad.

"(3) The defendant, seeking a market abroad, made proposals to the plaintiffs to act as its agents in this behalf; and thereupon parties entered into contract as follows:

" 'Memorandum of agreement, made and executed this 29th day of May, 1891, by and between Angus Cameron, the president of the Albion Phosphate Mining and Chemical Company of Baltimore, Maryland, on behalf and with the full authority of the said company, of the first part, and C. C. Wyllie and John F. Gordon, doing business under the name of Wyllie & Gordon, at London, England, of the second part, witnesseth: First. That the party of the first part agrees to consign to the party of the second part all the phosphate rock and phosphatic material produced by the said Albion Phosphate Mining and Chemical Company, which the said party of the first part may desire to sell in any of the markets of Europe; said rock to be sold by the said Wyllie & Gordon for and on account of the said Albion Phosphate Mining and Chemical Company upon the following terms, to wit: That during the existence of this contract the party of the first part will ship, in such quantities and to such address as may be directed by the party of the second part, all the phosphate rock and phosphatic material produced by the Albion Phosphate Mining and Chemical Company which they may desire to sell in any of the markets of Europe; such shipments to be handled and sold by the party of the second part to the best advantage of the party of the first part, they to receive as their entire compensation for such services, and for guarantying the sales, a commission of three (3) per cent. upon the gross amount of all sales made by them. All commissions allowed to Wyllie & Gordon by shipowners or brokers shall be carried to the credit of the Albion Phosphate Mining and Chemical Company in the account of sales rendered. That, against all the bills of lading of rock so shipped, the said Albion Phosphate Mining and Chemical Company shall have the right to draw

drafts at ten (10) days' sight upon the said Wyllie & Gordon for three-quarters of the estimate value at the port of shipment of each cargo, based upon the value of the same in England, less freight. That, as soon as possible after the discharge of each cargo, the said Wyllie & Gordon shall forward to the said Albion Phosphate Mining and Chemical Company account sale of such cargo, and remit to them at the same time the remaining proceeds, if any. Should the net proceeds of any cargo be less than the amount advanced by said Wyllie & Gordon against the same, the draft against the next succeeding shipment shall be reduced by the amount of such deficit. It is further agreed that Wyllie & Gordon shall arrange to pay all ocean freight, and all advances of money made by them for this or any other purpose shall carry interest at the rate of five per cent. per annum. It is further agreed that all shipments made under this agreement by vessels chartered by Wyllie & Gordon shall be fully insured by them, and, in cases where freight is arranged by the Albion Phosphate Mining and Chemical Company, the shipments shall be insured by them. The said Wyllie & Gordon agree to act as the agents of the said Albion Phosphate Mining and Chemical Company upon the above-recited terms and conditions, and covenant faithfully to account for their actions and doings as such agents. Each party shall have the right at any time to cancel this agreement on giving ninety (90) days' notice in writing, or by cable, to the other party. After giving such notice, it shall be lawful for the said Albion Phosphate Mining and Chemical Company to sell direct to the European markets, or through other agents than Wyllie & Gordon, such of said Florida phosphates produced by them as they may see fit; but upon all such sales made prior to the expiration of said ninety (90) days said Wyllie & Gordon shall be entitled to the same commissions as if said sales had been made by them.'

"(4) Defendant, in November, 1891, shipped by the steamship Cyanus a cargo of phosphate rock to fill a contract made in their behalf by the plaintiffs. The contract called for 2,000 tons. The defendants could only supply 1,342 tons. To fulfill the contract, and prevent its rejection and loss consequent thereon, the plaintiffs furnished the deficiency, 658 tons, from other customers of theirs, with a net gain to defendant of £247. 2s. 7d.

"(5) Plaintiffs, on the 26th August, 1892, on behalf of defendant, entered into a contract with T. G. Gleichman in the tenor following:

" 'T. G. Gleichman, Esq., Hamburg: We beg to confirm having (as agents) sold to you about 1,800–2,400 tons (our option) of dried Albion Florida phosphate (guarantied to contain not less than 75 per cent. phosphate of lime calculated on a dry basis), at the price of eight pence farthing per unit of tribasic phosphate of lime (calculated on a dry basis from the total phosphoric acid present) per ton of 2,200 lbs. English, coast freight and insurance to a good, safe continental port between Havre and Hamburg (both inclusive), or as near thereto as the ship can safely get, always afloat. Mean analysis of oxide of iron and alumina guarantied not to exceed 4 per cent., but, if it exceeds 3 per cent., allowance to be made in the proportion of two units of phosphate of lime for every 1 per cent. oxide of iron and alumina in excess of 3 per cent. Shipment September–October, 1892. Payment, cash in London on arrival of vessel against documents for three-fourths (¾) of amount of pro forma invoice, based on 75 per cent. phosphate of lime and B. L. weight, less freight, and balance in cash in London on receipt of final invoice, less 2½ per cent. on gross amount of same. Cargo to be weighed on board, and to be taken from ship's tackle at buyer's expense and risk. Landing expenses (if any), weighing, sampling, and all other charges at port of discharge to be for buyer's account; delivery to be taken by buyers on terms of charter party, and they to pay any demurrage arising from their failure to do so. Buyers to act in interest of sellers, and, if required, to take any powers of charter to recover from ship for damage; also, to pay freight in accordance with charter party for seller's account without charge and free of commission, any in charter being for seller's benefit. Two per cent. of cargo, every fiftieth bucket or basket, as it comes out of ship's hold, to be taken as sample without discharge. Each day's samples to be placed in bags (provided by buyers), which shall be sealed each day, and kept on board (under cover) until completion of discharge; then to be forwarded (still under cover) to buyer's works, and samples for analysis to be prepared from same (under mutual supervision) in the following manner: The rock first to be crushed, and samples for moisture to be taken therefrom; then to be finely ground through millstones, and fair samples to be taken therefrom for determination of phosphates of

lime on dry basis, and iron and alumina, etc. These samples to be sent for analysis to two of the following chemists, one chosen by buyers, and one by sellers, viz.: Dr. Voelcker & Sons, London; Dr. Pieper, Hamburg; Professor Fresinus, Wiesbaden,—with instructions to send copies of analysis direct to both buyers and sellers. In event of a divergence of over 2 per cent. in the result in phosphates of lime, or 1 per cent. in iron and alumina, sellers to send third sample to be tested by the third chemist, and the result of the two nearest analyses (on dry basis) to form basis for invoice. Cost of analysis to be equally divided. Mean moisture found in moisture sample (by drying at 212 degrees F.) to be deducted from weight. Any phosphate found to be ship or sea damaged on arrival at port of discharge to be accepted by buyers without allowance, but excess of moisture in such proportion to be deducted from weight. No damaged phosphate to be included in samples of cargo. Each shipment to stand as a separate contract. Should yellow fever or political or other force majeure event prevent or delay shipment of any portion of above, no responsibility to accrue therefrom. If phosphates not shipped by 10th November, 1892, buyers to have option of canceling contract. Should any vessel or vessels declared by sellers as forming part of this contract be lost with phosphate cargo on board, or jettison any portion of said cargo, the contract to be void to that extent, and buyers to give up documents (should any have been sent to them) to enable sellers to recover insurance for latter's own account. Any dispute arising under this contract shall be settled by arbitration in London, in accordance with the provisions of the arbitration act, 1889, or any modification or amendment thereof, arbitrators being mutually chosen. Wyllie & Gordon, as Agents.'

"(6) The rock was delivered to Gleichman. Samples were taken of it in the discharge of cargo, by retaining every fiftieth bag. The contents of these bags were sent to the phosphate works of the purchaser, and there ground. Samples of the ground rock were then submitted separately to the two chemists selected in the contract of sale. Their analyses agreed in finding the rock to contain —— per cent. of ——, and four and one-half per cent. of iron and alumina. Thereupon Gleichman declared the contract forfeited, and refused to receive the rock as good delivery, and offered to return the same on payment of expenses. Meanwhile the cargo, delivered at the port of Hamburg, had been sold to one Meyer, and had been transported to Hanover, in accordance with the custom of trade.

"(7) Under the custom of this trade, and the terms of the contract, when the bills of lading and certificates of insurance, called the 'documents,' are handed to the proposed purchaser, he pays 75 per cent. of the contract price, returnable to him, however, if the contract should fail. In the present instance, Gleichman never paid this seventy-five per cent. on this Oaklands cargo. He was a large customer of Wyllie & Gordon, and had continuous dealings with them, frequently paying into their hands large sums of money. On this they relied. But, on the other hand, the plaintiffs had accepted and paid drafts of the defendant to the extent of 75 per cent. of its value. When Gleichman declared the contract of the Oaklands cargo off, he had in his hands two or more other cargoes not paid for, for Wyllie & Gordon, in which, however, defendant had no interest.

"(8) Nothing was said as between plaintiffs and defendant as to this 75 per cent. to be paid by the purchasers. Defendant never inquired whether it was paid, plaintiffs never informing them that it was not paid.

"(9) Plaintiffs at once began efforts to arrange the matters growing out of the rejected cargo, notified the defendant of it, obtained authority from the defendant to use their best judgment. After much negotiation, investigation in Germany by one of their clerks, who had had large experience, and was of recognized ability, and great labor on their part, the plaintiffs settled the matter by selling the whole cargo to Gleichman at a reduction of £2,400 from the price on the broker's contract.

"(10) Upon reporting this to the defendant, and admitting that it was sheer robbery, but at the same time inevitable, the defendant became dissatisfied, expressed dissatisfaction, and finally refused to recognize the settlement.

"(11) It does not appear that the defendant knew anything of the state of affairs between the plaintiffs and Gleichman, or the course of dealing between them.

"(12) Besides these transactions with the cargoes of the Cyanus and of the Oaklands the plaintiffs, as agents of defendant, and by their authority and assent, had contracted to sell a cargo of phosphate rock by the Hessle of 2,050 tons. The defendant could only supply 500 tons. Plaintiffs, at their request and for them, supplied the other 1,550 tons from other customers, and completed the contract.

"(13) Plaintiffs also, as agents for defendant, contracted to sell for them, at their instance and request, two other cargoes of phosphate rock,—one to the Silesia Verein, of 1,800 tons; the other to the Theo. Pyrkosch, for 2,000 tons. The defendant was unable to fulfill either contract. Under the advice of the plaintiffs, negotiations were successfully completed, releasing defendant from these two contracts.

"(14) The plaintiffs charge in their account commissions on the Cyanus contract, for the whole amount of rock delivered, including the deficiency supplied by themselves; for the whole Oaklands contract; for the whole Hessle contract, including the deficiency supplied by themselves; and for both of the released contracts, that to the Silesia Verein and that to Theo. Pyrkosch."

On the findings of fact, the court held as conclusions of law:

(1) That the contract between the plaintiffs below and Gleichman was not fulfilled, and that Gleichman had a right to treat the rock as not a true delivery.

(2) That the plaintiffs below, Wyllie & Gordon, acted in good faith, with reasonable skill and ordinary diligence, looking primarily to the interests of the defendant below, the Albion Phosphate Mining & Chemical Company; that, if they erred at all in the concession made to the purchaser of the rejected cargo, it was an error of judgment, for which they are not responsible; and that defendant below must make them whole.

On the question of commissions, the court found that, as to the cargoes of the Cyanus and Hessle, the plaintiffs below are entitled to full commissions; as to the cargo of the Oaklands, they are entitled on a quantum meruit to 3 per cent. on the first contract; that on the other contracts, which were rescinded, they should be allowed 1½ per cent.

To the findings of fact and to the conclusions of law the defendant below filed its bill of exceptions, embracing 14 principal grounds of exception; and these are the basis of the assignments of error, which are 14 in number, under several of which are a number of subassignments.

The first and second assignments of error relate to the admission by the court of certain testimony, verbal and written, to prove that the plaintiffs, as defendant's agents, had made two contracts in Germany to sell two cargoes of phosphate rock; that the defendant was unable to fulfill either of these contracts; and that the same were canceled by the plaintiffs, Wyllie & Gordon, for the defendant, before any shipment made, by the plaintiffs' advice. The ground of these assignments of error is that, under the pleadings in the case, evidence except for commissions on account of sales of the cargoes shipped by the steamers Cyanus, Oaklands, and Hessle, as sued on, was irrelevant and inadmissible; and the commissions for the other cargoes or parts of the Hessle's cargo not in said account could not be recovered in this suit. The commissions in the account on which the action was brought are not itemized and assigned to the several sales made of the cargoes shipped by the steamers named, but are embraced in an aggregate sum of £463. 7s. 7d., stated in the final account "commissions as per statement." The words "as per statement," when attached to an aggregate sum, import that an itemized or more particular state-

ment has been furnished the party charged with the aggregate amount of the demand, and that he is in possession of the information which a statement in detail would furnish him. The Code of Procedure of the state of South Carolina governs the law practice of that state, as it does on the law side of the United States courts in the district of South Carolina. Section 179 of the Code of Procedure provides as follows:

"Sec. 179. It shall not be necessary for a party to set forth in a pleading the items of an account therein alleged; but he shall deliver to the adverse party, within ten days after a demand therefor in writing, a copy of the account, which, if the pleading is verified, must be verified by his own oath, or that of his agent or attorney, if within the personal knowledge of such agent or attorney, to the effect that he believes it to be true, or be precluded from giving evidence thereof. The court, or a judge thereof, may order a further account, when the one delivered is defective, and the court may in all cases order a bill of particulars of the claim of either party to be furnished."

Under this provision of the Code of Procedure, the defendant had ample means of ascertaining, before the trial, the items that made up the aggregate claim for commissions. It contented itself with filing a general denial to the allegation of the complainant as to its liability to the plaintiffs for any sum. Having failed to avail itself of the provisions of the section quoted to ascertain the different items composing the aggregate amount claimed as commissions, and having by its denial put the plaintiffs to the proof of their claims, it had no right to object to the plaintiffs proving the several sums that constituted the full amount demanded. It was not error in the court to admit the testimony. Pelzer Manuf'g Co. v. St. Paul F. & M. Ins. Co., 41 Fed. 274.

The third assignment of error is that the court erred in permitting the plaintiffs to prove that they, as agents for the defendant, had made a contract with Theodore Pyrkosch for the sale of 2,000 tons of phosphate rock; that of this cargo, shipped by the Hessle, the defendant could only furnish 512 tons of such rock; and that the plaintiffs supplied the rest from other sellers, and filled the contract, and were entitled to commissions on the whole cargo of 2,000 tons; and that this claim constitutes part of the items in plaintiffs' account, for £463. 7s. 7d., designated "commissions as per statement." The ground of error is the same as stated in assignments 1 and 2; that is, that, under the pleadings in the case, the evidence was irrelevant, except as to the commissions on the proceeds of the cargoes of the steamers Cyanus, Oaklands, and such part of the cargo of the Hessle as the defendants furnished. What we have said in connection with assignments of error 1 and 2 is applicable to the third, and need not be repeated.

The fourth and fifth assignments are, in effect, the same:

"That the court erred in admitting in evidence the following testimony of Gordon, a witness for the plaintiffs: That, according to the custom of the trade, the rest of a cargo of phosphate, except the buckets drawn for samples, was always delivered at once to the buyer, if said buyer has made the financial arrangements satisfactory, and the buyer then does what he pleases with the cargo; that in this case the cargo of the Oaklands was delivered to the buyer, Gleichman, at once, and shipped by him to Hanover to one Meyer, to whom he had sold it before the analyses were received.'"

The ground of error assigned is that proof of any custom was inadmissible, for the reason that the rights and duties of the parties were controlled by the written contract of August 26, 1892, between the plaintiffs (on behalf of the defendant) and Gleichman.

The law is well settled that proof of a custom or usage inconsistent with a contract, and which either expressly or by necessary implication contradicts it, cannot be received in evidence to affect it. But it is equally well settled that, while a custom will not vary a written contract, yet a custom relating to the subject-matter of a contract becomes part of the contract, unless by its terms the custom is excluded.

In Robinson v. U. S., 13 Wall. 363, Mr. Justice Davis said:

"If a person of a particular occupation in a certain place makes an agreement by virtue of which something is to be done in that place, and this is uniformly done in a certain way by persons of the same occupation in the same place, it is but reasonable to assume that the parties contracting about it, and specifying no manner of doing it different from the ordinary one, meant that the ordinary one, and no other, should be followed. Parties who contract on a subject-matter concerning which known usages prevail, by implication incorporate them into their agreements, if nothing is said to the contrary."

The doctrine is thus stated in Addison on Contracts:

"The known and received usage of a particular trade or profession, and the established course of every mercantile or professional dealing, are considered to be tacitly annexed to the terms of every mercantile or professional contract, if there be no words therein expressly controlling or excluding the ordinary operation of the usage, and parol evidence thereof may consequently be brought in aid of the written instrument." Page 851.

The evidence admitted by the court below that it was the custom of the trade in Germany in the sale of phosphate rock that the whole of the cargo, except the buckets drawn as samples, is on the arrival of the vessel delivered at once to the buyer, and that the buyer disposes of it as he pleases, did not tend to contradict the contract between Wyllie & Gordon, agents for the plaintiff in error, and Gleichman. This usage being known to both the agents of the plaintiff in error and to Gleichman, it was part of the contract. In view of this custom of the trade, the contention of the plaintiff in error that its agents (the defendants in error) should not have delivered the cargo to Gleichman's possession, and have suffered him to remove the same from the port at Hamburg, and to sell it to one Meyer, until the same had either been rejected or accepted under the contract, cannot be sustained. The written contract itself, in substance, contains what is established by the evidence as the custom of the business touching the delivery of the cargo. It provides:

"Cargo to be weighed on board, and to be taken from ship's tackle at buyer's expense and risk; landing expenses (if any), weighing, sampling, and all other charges at port of discharge to be for buyer's account, delivery to be taken by buyers on terms of charter party, and they to pay any demurrage arising from their failure to do so."

It further provides that:

"Each day's samples to be placed in bags (provided by buyers), which shall be sealed each day, and kept on board (under cover) until completion of discharge;

then to be forwarded (still under cover) to buyer's works, and samples for analysis to be prepared from same (under mutual supervision) in the following manner. * * *"

By the custom of the trade, as shown by the testimony, Gleichman, after the delivery to him as provided in the contract, had a right to sell, as he did, the cargo to Meyer. He was not bound to hold the cargo pending the analysis of the samples.

There is no question that the cargo of the Oaklands (and this is the only one under discussion) did not meet the requirements of the contract of sale to Gleichman, as is shown by the analyses of the two chemists to whom the samples were submitted, as stated under the sixth finding of facts. It being conceded that the cargo of phosphate rock delivered to Gleichman was not of the quality contracted for, the plaintiff in error still insists that it should not be held responsible to its agents, Wyllie & Gordon, for the advance of 75 per cent., made by said agents to the plaintiff in error on the estimate value of the cargo at the port of shipment. Its defenses are stated in assignments of error from 6 to 11, inclusive, and are all on the ground that the court erred in finding as a conclusion of law that the contract was not fulfilled, and that Gleichman "had the right to treat the rock as not a true delivery," and "that plaintiffs [plaintiff's below, defendants here] acted in good faith, with reasonable skill and ordinary diligence, looking primarily to the interests of the defendant [plaintiff here]"; that, if they erred at all in the concession made to the purchaser of the rejected cargo, it was an error of judgment, for which they are not responsible; and that defendant (plaintiff in error) must make them whole. These defenses are: "(1) That Wyllie & Gordon, as agents of the plaintiff in error, should not have conceded that the rock was not a true delivery, but should have insisted on that question being submitted to arbitration, according to the arbitration clause of the contract, and that it was their duty to do so. (2) That Wyllie & Gordon did not retain control of the cargo, but delivered it into the possession of Gleichman, and had allowed him to resell it to Meyer, and had allowed the cargo to be transported to the interior of Germany, without collecting from Gleichman the three-fourths of the invoice value in cash, against the documents, as stipulated in the contract. (3) That unless Gleichman had elected to rescind the contract, and return the cargo at a place where defendant was bound to receive it, he was not entitled to a return of the seventy-five per cent.; that Wyllie & Gordon sold said cargo to Gleichman as agents; and that any liability to return said seventy-five per cent. rested on the plaintiff in error, and not on Wyllie & Gordon, its agents. (4) That the defendants in error did not act in good faith with their principal when they concealed the fact that Gleichman owed them money on two cargoes with which plaintiff in error was in no way connected, at the time they delivered the cargo of the Oaklands into his hands, and that they failed to disclose to the plaintiff in error the fact that they had delivered said cargo without collecting the seventy-five per cent. on the invoice value, as required by the contract."

The questions raised by these defenses are so clearly and forcibly discussed by Judge Simonton in his opinion rendered in the court below that this court, on this branch of the case, will adopt his views as expressive of its own:

"As a conclusion of law, I hold that the contract was not fulfilled, and that Gleichman had the right to treat the rock as not a true delivery. 2 Benj. Sales, 590; Pope v. Allis, 115 U. S. 371, 6 Sup. Ct. 69.

"It is urged that the plaintiffs should have used the arbitration clause inserted at the end of the contract. But the contract had already made ample provision for determining this question,—one conclusive on the parties. The chemists settled the analysis. Clearly, the matters to be arbitrated under this concluding clause could not include the analysis. This being so, and the analysis having shown the nonperformance of the guaranty, the contract was at an end, and all its provisions fell to the ground.

"The contract having thus ended, did the plaintiffs discharge their full duty to the defendant in this emergency? They had on hand a cargo of rejected rock. It was in the interior of Germany. To get actual possession of the cargo, and to deliver it to a new purchaser, involved large expense. Its sale would be attended with many disadvantages, because of the rejection. Besides this, there was the inevitable suit for damages for breach of contract. The plaintiffs had authority to exercise their best judgment. They concluded that a deduction of £2,400 was the best settlement they could effect. Was this conclusion in good faith, looking to the interests alone of the defendant, and after the use of reasonable skill and ordinary diligence?

"The defendant urges that the disadvantageous circumstances under which the settlement was made grew out of the fact that the plaintiffs had not demanded and received the 75 per cent. of the value of the phosphate on the delivery of the documents. Had this been done, then the purchaser, when he rescinded his contract, would have been compelled to sue his vendor, and become the suitor. But, as has been seen, the contract failed because of the failure of the guaranty. Upon failure of the contract, plaintiffs were bound to return any advance made. To a demand for it, they could make no defense other than the validity of the contract. Besides this, the liability for the return of this 75 per cent. was the liability of the plaintiffs themselves. They could not be required to stand suit, and injure their own credit, not for the purpose of testing the validity of the action of the purchaser in rescinding the contract, but to enable the defendant to resell the rock on more favorable terms. By omitting to demand the payment of the 75 per cent., the plaintiffs became personally liable for it had the contract been consummated. In fact, they paid a sum equal to it over to the defendant.

"It is also urged that plaintiffs did not act in good faith when they concealed from defendant the fact that, at the time the matters connected with the cargo were settled, Gleichman owed them for two cargoes. But the defendant knew that the plaintiffs did a large business, and that it was not the only customer they had. Besides this, the question plaintiffs had to meet was how best to dispose of the rock of the defendant thrown back on their hands for breach of warranty. It is difficult to see in what way the fact that Gleichman owed them for two cargoes could affect that question."

The twelfth, thirteenth, and fourteenth assignments of error may be considered together. The grounds on which they are made are on the exceptions taken to the finding of the court in its allowance of commissions to the defendants in error. On the cargoes of the Cyanus and of the Hessle, the court allowed them full commissions, on the ground that they made good the deficiency, and completed the whole contract, with advantageous results to the plaintiff in error. On the cargo of the Oaklands, it held that the del credere commission was not earned, but that on a quantum meruit they were entitled to a sum equal to the contract commission on the first sale. As to the other cargoes, it held that the

defendants in error had procured the contract of sale, but these contracts were, with their consent and advice, rescinded, and that the agents could only demand proportionate compensation. These findings are in accordance with well-settled principles of law. As to the cargoes of the Cyanus and Hessle, they made complete sales; and, when the plaintiff in error was unable to make up the cargoes, their agents procured from other sources the necessary quantity of phosphate rock to make up the deficiency, and thus enabled the plaintiff in error to carry out fully the contracts. McGavock v. Woodlief, 20 How. 221; Kock v. Emmerling, 22 How. 69. The compensation allowed on the other contracts rests upon the principle that where the service is begun, and an important part performed, and the factor or broker is prevented by some irresistible obstacle from completing it, and is himself without fault, he is entitled to proportionate compensation. 1 Pars. Cont. 84.

There is another ground of error assigned in connection with the allowance of commissions which was considered under the first three assignments; that is, that the court below could not, under the pleadings in the case, receive testimony as to the items making up the account for commissions. We have disposed of that question, and its further consideration is unnecessary.

We find no error in the record, and the judgment of the circuit court is affirmed.